**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

STACEY LYNN RUFFLEY,     )
    )
           Plaintiff,     )     Civil Action No. 13-291 Erie
    )
   v.     )
    )
CAROLYN W. COLVIN,     )
Acting Commissioner of Social Security,    )
    )
           Defendant.     )

## MEMORANDUM OPINION

**NORA BARRY FISCHER, District Judge.**

## I.  INTRODUCTION

Stacey Lynn Ruffley, ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),
seeking review of the final determination of the Commissioner of Social Security
("Commissioner" or "Defendant") denying her applications for disability insurance benefits
("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security
Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq.*  This matter comes before the Court on cross-
motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.
(ECF Nos. 10, 12).  The record has been developed at the administrative level.  (ECF No. 7).[1]
For the following reasons, Plaintiff's Motion for Summary Judgment (ECF No. 10) is denied and
Defendant's Motion for Summary Judgment (ECF No. 12) is granted.

## II.  PROCEDURAL HISTORY

Plaintiff filed her applications on May 21, 2010, claiming disability since February 17,
2006, due to diabetes, diabetic neuropathy, carpal tunnel syndrome, and depression.  (R. at 148-
153, 200).  Her applications were denied (R. at 77-100), and she requested a hearing before an
administrative law judge ("ALJ").  (R. at 101).  A hearing was held on January 20, 2012,
wherein Plaintiff appeared and testified, and James Rossi, an impartial vocational expert, also

---

[1] References to the administrative record (ECF No. 7), will be designated by the citation "(R. at ___)".

appeared and testified. (R. at 42-65). On February 13, 2012 the ALJ issued a written decision denying benefits. (R. at 19-37). Plaintiff's request for review by the Appeals Council was denied (R. at 1-4), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). She filed her complaint challenging the ALJ's decision on September 25, 2013 (ECF No. 3), and the parties subsequently filed cross-motions for summary judgment. (ECF Nos. 10 and 12). Accordingly, the matter has been fully briefed and is ripe for disposition.

## III. BACKGROUND

### A. General Background

Plaintiff was thirty-six years old on the alleged disability onset date. (R. a 35). She was a high school graduate, and continued working at substantial gainful activity levels until March 2010. (R. at 22-23, 35). Thereafter, Plaintiff worked part-time as a waitress at Bob Evans restaurant. (R. at 52, 201, 277). Plaintiff also previously worked as a data entry clerk. (R. at 201).

### B. Medical Background

#### Physical impairments

Plaintiff was seen by Jill Fuller, a CRNP at Community Health Net, on January 27, 2010 and reported that she was a diabetic, but had not been on medication for four years due to a lack of insurance. (R. at 252). Plaintiff complained of painful neuromas on the bottom of her left foot. (R. at 252). She was assessed with Type 2 diabetes, noncompliant. (R. at 252). Ms. Fuller started her on Metformin and Glipizide, and completed medical assistance disability forms. (R. at 252). Ms. Fuller ordered blood work to be completed once Plaintiff secured insurance. (R. at 252). On February 10, 2010, it was noted that Plaintiff's blood sugar levels were in the 200's. (R. at 251). She was referred to a podiatrist for her foot complaints, and an EMG was ordered for her arms and hands.[2] (R. at 251). On February 24, 2010, Plaintiff complained of numbness in her wrists and hands, and indicated that she wore wrist splints at night. (R. at 250). Ms. Fuller assessed her with, *inter alia*, peripheral neuropathy and diabetes.

---

[2] These test results are not included in the administrative record.

Plaintiff was seen by Santo Fioretti, DPM on February 26, 2010 and complained of painful bumps on her feet. (R. at 272). Physical examination revealed nodules in both feet and pain on palpation. (R. at 274). Plaintiff was diagnosed with plantar fibromatosis of both feet, and Dr. Fioretti scheduled surgery for the removal of the nodules in her left foot. (R. at 274).

Plaintiff returned to Ms. Fuller on March 3, 2010, who reported that Plaintiff's blood sugar levels had improved. (R. at 249). Plaintiff was assessed with bilateral foot neuromas, diabetes, carpal tunnel, and conjunctival hemorrhaging secondary to uncontrolled diabetes, and was referred to an ophthalmologist. (R. at 249).

Plaintiff had foot surgery on March 17, 2010 and did well post-operatively with minimal complaints. (R. at 276). On March 30, 2010, Ms. Fuller reported that Plaintiff's blood sugar levels had greatly improved, and Plaintiff reported that her foot pain was not bad post-surgery. (R. at 248). By April 14, 2010, Dr. Fioretti reported that Plaintiff had "healed satisfactorily" and she was released to return to her regular work duties. (R. at 276).

When seen by Ms. Fuller on April 22, 2010, Plaintiff complained of a sinus infection for which she had been treated in the emergency room. (R. at 246). Ms. Fuller reported the bottom of Plaintiff's foot was healing "very well." (R. at 246). Plaintiff reported pain and some loss of sensation, but stated overall she was "pretty happy" with the surgery. (R. at 246). Plaintiff was diagnosed with lingering bronchitis and bronchospasm. (R. at 246). Ms. Fuller administered an albuterol breathing treatment, and prescribed a nebulizer for home use. (R. at 246). She also prescribed Neurontin. (R. at 246).

On June 9, 2010, J.P. Dailey, M.D., an ophthalmologist, completed a questionnaire stating that Plaintiff was diagnosed with non-proliferative diabetic retinopathy and diabetic macular edema on April 19, 2010. (R. at 264). Plaintiff reported increased eye pain and "floaters," but her symptoms had improved in February 2010 with new glasses. (R. at 264). He prescribed eye drops and recommended that she control her blood sugar, blood pressure and cholesterol. (R., at 265). Dr. Dailey noted that diabetic retinopathy was a lifetime condition and that Plaintiff's prognosis was guarded. (R. at 270).

On July 28, 2010, Plaintiff underwent a consultative physical examination performed by Joseph Prezio, M.D. (R. at 280-284). Plaintiff reported a history of diabetes without treatment for a number of years. (R. at 280). Plaintiff further reported diabetic neuropathy in both feet, early stages of retinopathy in both eyes, depression, and carpel tunnel syndrome in both hands. (R. at 280). Plaintiff reported that splints had not proved helpful, and she had feelings of numbness and pain in her hands at night. (R. at 280). Plaintiff was able to perform activities of daily living such as cooking, cleaning, laundry, shopping, and personal care, but stated that foot pain compromised these activities at times. (R. at 281). Dr. Prezio noted that Plaintiff was in no acute distress but did not make good eye contact during the examination.

On physical examination, Dr. Prezio reported that Plaintiff had a normal gait and stance, did not require an assistive device, but she was unable to heel and toe walk. (R. at 281). Plaintiff was able to fully squat, but had pain in her left foot. (R. at 281). Plaintiff did not require assistance getting on or off the exam table or rising from a chair. (R. at 281). Plaintiff had some diminished range of motion of her left ankle, pinpoint tenderness along the incision of her left foot, and the probable presence of a fibroma in her right foot, but her remaining physical examination was unremarkable. (R. at 282). Plaintiff exhibited a full range of motion of her back, shoulders, elbows, forearms, wrists, hips and knees. (R. at 282). She also had full strength in her extremities, her joints were stable and non-tender, there was no swelling or effusion, she had equal tendon reflexes, there was no muscle atrophy, she had intact hand and finger dexterity, and full grip strength. (R. at 282-283).

Dr. Prezio diagnosed Plaintiff with diabetes mellitus, carpal tunnel syndrome by history, diabetic neuropathy by history, early diabetic retinopathy by history, fibroma of the plantar surface of the right foot, and obesity. (R. at 283). He opined that Plaintiff had mild to moderate restrictions for standing, walking, squatting and kneeling due to "compromised pain" from the removal of her left foot fibromas and the presence of a fibroma in her right foot. (R. at 283). He indicated that Plaintiff should avoid any repetitive activity that involved her left foot until her pain resolved. (R. at 283-284). Dr. Prezio further opined that Plaintiff had mild restrictions of

4

activities requiring fine manipulation based upon her suggestive history of carpal tunnel syndrome. (R. at 283).

Plaintiff was seen by Christopher Colburn, O.D. on September 9, 2010 for evaluation of visual fluctuations and floaters. (R. at 309). Dr. Colburn found Plaintiff's visual field results were inconsistent with her exam, and she had no symptoms of peripheral vision loss. (R. at 309). He diagnosed her with moderate non-proliferative diabetic retinopathy, and stated that although it could cause vision loss in the future, she had normal vision function at that time. (R. at 309).

On October 1, 2010, Plaintiff returned to Ms. Fuller and it was noted that her blood sugar readings were in the 200 to 400 range. (R. at 317). She was assessed with uncontrolled diabetes and prescribed Glucophage, Glipizide and Lantus. (R. at 317). On November 12, 2010, Plaintiff complained of difficulty walking, but stated she did not want to return to see Dr. Fioretti. (R. at 318). She was assessed with neuropathy and uncontrolled diabetes. (R. at 318). It was noted that Plaintiff had not completed the lab work ordered, and she was informed that she needed to get her sugar under control. (R. at 318).

On December 24, 2010, Plaintiff was seen by N. Reddy, M.D. at Saint Vincent Family Medicine Center. (R. at 319). Plaintiff reported that her blood sugar readings ran above 230, but acknowledged she was not controlling her diet. (R. at 319). Plaintiff further reported that she had severe diabetic neuropathy, for which she took Neurontin. (R. at 319). Plaintiff's physical examination was essentially unremarkable, except for some swelling of the second and third toes of her left foot with some peripheral neuropathy noted. (R. at 321). She was diagnosed with, *inter alia*, diabetes mellitus and diabetic polyneuropathy, and Dr. Reddy ordered lab studies and recommended consultation with an ophthalmologist and podiatrist. (R. at 321). Plaintiff was advised to follow a strict diet and continue her current insulin dosage, and continue taking Neurontin for her neuropathy. (R. at 322).

On January 12, 2011, Plaintiff presented for treatment of a rash, and reported that she worked as a waitress. (R. at 332). On August 11, 2011, Plaintiff reported to Dr. Reddy that she was non-compliant with her diet and exercise, and that her home blood sugar readings ranged between 240 and 300. (R. at 336). Dr. Reddy noted that Plaintiff was not taking her insulin

correctly, in that she ran out of the Lantus six weeks prior but had never called the office for a refill. (R. at 336). Her physical examination was normal, with no joint swelling or evidence of foot ulcers. (R. at 337). Dr. Reddy restarted her insulin, and encouraged weight loss and a regular exercise program. (R. at 338). Dr. Reddy discussed the importance of the adherence to treatment in the management of diabetes, but reported that Plaintiff was "not a well motivated patient." (R. at 338).

When Plaintiff returned to Dr. Reddy on October 21, 2011, Dr. Reddy again reported that Plaintiff was non-compliant with respect to her diet and medication regimen. (R. at 339). Physical examination revealed swelling in the third and fourth toe of her left foot, and it was noted that Plaintiff was using "diabetic shoes." (R. at 341). Plaintiff was diagnosed with uncontrolled diabetes mellitus, and Dr. Reddy recommended that she check her blood sugar levels three times per day and call the office with the results. (R. at 341). She was to consult with podiatry for further management of her foot.[3] (R. at 341).

On December 28, 2011, Plaintiff reported that she was not following her diet or taking insulin regularly due to working. (R. at 342). Plaintiff informed Dr. Reddy that she was not interested in taking short-acting insulin at mealtimes, and admitted she was not checking her insulin frequently. (R. at 342). Plaintiff reported that she was applying for disability, and acknowledged that she presented for her current appointment in response to repeated calls from the office after her attorney kept forwarding papers to be completed by Dr. Reddy.[4] (R. at 342). Her physical examination was unremarkable, except for some decreased sensation noted in both feet. (R. at 343). Plaintiff was not interested in increasing or changing her insulin regimen. (R.

---

[3] In her Brief, Plaintiff cites to treatment records from Richard Sieber, DPM, from May 20, 2011 through March 2, 2012 (R. at 365-379). *See* (ECF No. 11 at 11-13). This evidence, however, was not considered by the ALJ in evaluating the Plaintiff's claims, and therefore we cannot consider this evidence in our substantial evidence review of the ALJ's decision. *See Matthews v. Apfel*, 239 F.3d 589 (3d Cir. 2001). *Matthews* held that in order to qualify for a remand option, three requirements must be satisfied: (1) the additional evidence must be "new"; (2) it must be "material" to determination of the claimant's disability benefits claim; and (3) there must be "good cause" for the claimant's failure to present the new evidence in a prior proceeding. *Matthews*, 239 F.3d at 593 ("[W]hen [a] claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ."). Plaintiff has failed to establish, or even address, any of these three requirements.

[4] The office note from this visit reflects that a disability form was completed by Dr. Reddy "for attorney[']s office" (R. at 344), but this form does not appear in the administrative record.

at 344). Dr. Reddy recommended she be referred to endocrinology and a visit with a diabetic educator. (R. at 344). An EMG study conducted December 2011 of Plaintiff's left lower limb was normal except for some moderate membrane irritability. (R. at 313).

Plaintiff returned to Dr. Dailey on January 19, 2012 and complained of difficulty focusing with an increase in floaters. (R. at 353). Dr. Dailey prescribed Bromday drops, and counseled Plaintiff on the importance of good glycemic control, exercise, lipid management, and regular visits with her primary care physician. (R. at 356).

### Mental impairments

On February 24, 2010, Plaintiff complained to Ms. Fuller of experiencing "some manic depression." (R. at 250). She stated she was unmotivated, did not like to socialize, and cried "the other day" for no reason. (R. at 250). Ms. Fuller assessed her with, *inter alia*, manic depression, prescribed Celexa and provided Plaintiff with phone numbers of counseling services. (R. at 250). On March 30, 2010, Plaintiff reported to Ms. Fuller that she had not noticed a difference while on Celexa, and Ms. Fuller increased her dosage amount. (R. at 248).

On June 18, 2010, Plaintiff presented to John Napoli, M.D. for treatment for depression. (R. at 277). Plaintiff reported that she took Celexa prescribed by a nurse practitioner since February 2010, but it had not helped. (R. at 277). Plaintiff reported a history of depression since her teens and that she had taken anti-depressants in the past. (R. at 277). She denied any history of suicide attempts or outpatient psychiatric treatment. (R. at 277). Plaintiff reported that she had a college education and worked as a waitress at Bob Evans Restaurant. (R. at 277). On mental status examination, Dr. Napoli found Plaintiff was fully oriented, had good eye contact, and her speech was normal in rate, rhythm, volume and quantity. (R. at 277). Plaintiff reported her mood as "sleepy, unhappy," she felt hopeless, helpless, useless, worthless and guilty, and suffered from crying spells. (R. at 277-278). Plaintiff claimed she snapped easily and yelled at people. (R. at 278). She denied experiencing panic attacks, agoraphobia or claustrophobia, and had no symptoms of compulsive behavior, phobias or mania. (R. at 278). Dr. Napoli found Plaintiff had normal concentration, and her insight, judgment and impulse control were intact. (R. at 278). Dr. Napoli diagnosed Plaintiff with major depressive disorder, and assessed her with

a Global Assessment of Functioning ("GAF") score of 45.[5]  (R. at 278).  Dr. Napoli increased her Celexa dosage and added Ambien for her reported sleep difficulties.  (R. at 278-279).

On July 28, 2010, Plaintiff underwent a psychiatric evaluation performed by Alan Dubro, Ph.D.  (R. at 285-290).  Plaintiff reported that she worked part-time as a waitress, but was having difficulty due to pain and fatigue.  (R. at 285).  Plaintiff reported depression, sleep difficulties, stress, fatigue, and self-isolation.  (R. at 285-286).  Plaintiff indicated that she intermittently experienced episodes of tachycardia and difficulty breathing when overwhelmed.  (R. at 286). She frequently felt nervous and anxious, and had concentration difficulties.  (R. at 286).  Plaintiff reported that she pushed herself to get out of bed and go to work and was able to maintain her hygiene on work days, but had no interest in doing so when not working.  (R. at 288).  Plaintiff claimed she could only stand on her feet for very short periods of time and prepare simple meals for herself.  (R. at 288-289).  Plaintiff further claimed that she had difficulty sustaining concentration and motivation to do laundry and shop for food, and typically required assistance from her mother and sister.  (R. at 289).  She no longer socialized with others, except for her immediate family, and used public transportation to get to work.  (R. at 289).

On mental status examination, Dr. Dubro reported that Plaintiff was fully oriented, cooperative, adequately groomed, and presented in an appropriate manner.  (R. at 287-288). Plaintiff established but did not consistently maintain eye contact during the exam.  (R. at 287). She had sluggish motor behavior, spoke slowly and in a soft tone, had coherent and goal directed thoughts, exhibited a blunted affect, and was "significantly" depressed during the exam.  (R. at 287).  Dr. Dubro found Plaintiff displayed significantly impaired attention and concentration and impaired memory secondary to distractibility associated with a depressed mood, along with

---

[5]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. Text Revision 2000).  An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" OR "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*

nervousness while performing simple mathematical calculations or recalling two out of three items. (R. at 288). He estimated her intelligence and fund of information were in the average range, and she had good insight and judgment. (R. at 288).

Dr. Dubro concluded the following:

> The claimant can follow and does understand simple directions and instructions. She is experiencing marked difficulties in her ability to attend and to remember directions and instructions. The claimant's attention span and concentration is markedly impaired. She is seen as an individual who would experience marked difficulties in learning new tasks. The claimant is displaying moderate difficulties in her ability to perform daily tasks independently on a regular basis. She is displaying marked difficulties in her ability to perform complex tasks independently. The claimant's ability to relate with others is moderately impaired. The claimant is seen as being capable of making appropriate decisions. The claimant is seen as an individual who will experience marked difficulties in her ability to regularly attend to a full-time routine and maintain a full-time schedule.

(R. at 289). Dr. Dubro diagnosed Plaintiff with major depression and anxiety disorder, not otherwise specified, and recommended that she continue outpatient psychiatric treatment. (R. at 290).

On August 17, 2010, T. Andrews, a state agency reviewing psychologist, reviewed the psychiatric evidence of record and concluded that Plaintiff had only mild restriction in her activities of daily living and social functioning, and no difficulties in maintaining concentration, persistence and pace. (R. at 301). He reviewed Plaintiff's treatment with Ms. Fuller and Dr. Napoli, reviewed the consultative examination report by Dr. Dubro, and considered Plaintiff's daily activities. (R. at 303). He observed that Plaintiff's daily activities were limited due to her obesity and physical limitations, and not due to her psychiatric impairments. (R. at 303). He found Dr. Dubro's assessment was inconsistent with medical evidence of record, and concluded that Plaintiff was capable of substantial gainful activity in a low contact setting. (R. at 303). He found Plaintiff was not significantly limited or only moderately limited in all mental work-related areas. (R. at 305-307).

On January 27, 2012, Melanie Dunbar, Ph.D., authored a letter stating that Plaintiff had attended four therapy sessions since December 8, 2011, and was diagnosed with major depression, recurrent, moderate. (R. at 358). She indicated that Plaintiff's treatment goals focused on coping skills for managing her moods, addressing the impact of her medical concerns and pain on her mood and functioning, setting healthy boundaries, and strengthening her sense of self. (R. at 358). Dr. Dunbar reported that Plaintiff was in the beginning stages of treatment and that her treatment goals had not been met, but she was actively engaged and motivated for change. (R. at 358). Dr. Dunbar completed a form stating, in a check mark fashion, that Plaintiff suffered from the following symptoms: anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. at 360). She opined that Plaintiff was moderately limited in her activities of daily living, experiences mild difficulty in maintaining social functioning, and had some deficiencies in concentration, persistence and pace. (R. at 360). With respect to any work limitations related to Plaintiff's psychiatric state, Dr. Dunbar stated she was unable to assess Plaintiff in twenty areas given the scope of treatment. (R. at 361-362). She assigned Plaintiff a GAF score of 55.[6] (R. at 360).

C. *Administrative Hearing*

Plaintiff and James Rossi, an impartial vocational expert, testified at the hearing held by the ALJ on January 20, 2012. (R. at 42-65). Plaintiff testified that she had difficulty regulating her blood sugar levels while working part-time. (R. at 49). She also suffered from neuropathy, which caused burning pain in her legs and feet, as well as pain in her hands. (R. at 50-51). She stated she saw "floaters" in her eyes which caused headaches. (R. at 50). Plaintiff stated that she used a cane and/or walker, and wore prescription shoes when at home. (R. at 50-52). She indicated that she used the cane at all times at home, but was not permitted to use it at work. (R. at 56). Plaintiff claimed she could only stand for about ten to fifteen minutes, walk a half block

---

[6] An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., no friends, conflicts with peers or co-workers)." *Id.*

before needing to stop, and lift about fifteen pounds. (R. at 50-51). She testified that she suffered from hammer toes that caused ulcers on the top of her toes. (R. at 51-52). She occasionally needed to elevate her feet. (R.at 58). Plaintiff stated that she also suffered from a tingling and burning sensation in her hands, and constantly dropped things. (R. at 50-51). She indicated that she wore splints at night which were no longer effective. (R. at 51). Plaintiff testified that she was compliant with her medication regimen. (R. at 56).

With regard to her depression, Plaintiff testified that on bad days, she stayed in bed all day, cried constantly, and did not take care of herself. (R. at 53). She testified that she had feelings of worthlessness and thoughts of suicide, but had never attempted suicide. (R. at 53-54). Plaintiff indicated that she no longer socialized. (R. at 55). Plaintiff testified that she worked part-time as a waitress, but had trouble performing her duties. (R. at 52). She was able to microwave meals, and perform household chores if she took a break between chores. (R. at 52). Her neighbor's son took out her trash, and she was unable to carry her laundry up or down the stairs. (R.at 53).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform sedentary work, but could never push or pull with her lower extremities bilaterally, or operate foot controls bilaterally. (R. at 61). The hypothetical individual could also never climb a ladder, rope or scaffold; never crawl; only occasionally balance, stoop, kneel and crouch; and must avoid concentrated exposure to unprotected heights, dangerous machinery and like hazards. (R. at 61). The hypothetical individual was further limited to understanding, remembering, and carrying out simple instructions and performing simple, routine tasks. (R. at 61). The hypothetical individual was also limited to only occasional, superficial interaction with co-workers and the public, with no transactional interaction, such as sales or negotiation, and was limited to a low-stress work environment, meaning no production rate pace work, but rather goal-oriented work, with only occasional and routine changes in the work setting. (R. at 61-62). The vocational expert testified that such an individual could perform the jobs of a charge account clerk, telephone quotation clerk, and document preparer. (R. at 62).

11

## IV. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Parales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[7], 1383(c)(3)[8]; *Schaudeck v.*

---

[7] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[8] Section 1383(c)(3) provides in pertinent part:

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

## V. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

---

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

In his decision, the ALJ found that Plaintiff had engaged in substantial gainful activity since her alleged onset date to March 17, 2010, but that there had been a continuous 12-month period in which Plaintiff had not engaged in substantial gainful activity. (R. at 21-22). The ALJ further found that Plaintiff had the following severe impairments: diabetes mellitus, diabetic polyneuropathy, major depressive disorder, anxiety disorder, obesity, right plantar fibromatosis, and status-post left plantar fibromatosis excision. (R. at 22-24). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1 of the regulations. (R. at 24-27). Despite her impairments, the ALJ found that she had the residual functional capacity ("RFC") to perform sedentary work, but could never push or pull with her lower extremities bilaterally, or operate foot controls bilaterally. (R. at 61). She could also never climb a ladder, rope or scaffold; never crawl; only occasionally balance, stoop, kneel and crouch; and must avoid concentrated exposure to unprotected heights, dangerous machinery and

like hazards. (R. at 61). The ALJ further found that Plaintiff was limited to understanding, remembering, and carrying out simple instructions and performing simple, routine tasks. (R. at 61). She was also limited to only occasional, superficial interaction with co-workers and the public, with no transactional interaction, such as sales or negotiation, and was limited to a low-stress work environment, meaning no production rate pace work, but rather goal-oriented work, with only occasional and routine changes in the work setting. (R. at 61-62). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing. (R. at 35-36). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff's first challenge relates to the ALJ's RFC assessment with respect to her physical impairments. "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121.

Plaintiff only vaguely asserts that she "objects" to the ALJ's evaluation of the medical evidence with respect to her physical RFC. *See* (ECF No. 11 at 14-15). She does not, however, suggest or point to any medical evidence that the ALJ rejected outright or failed to consider, nor does she challenge the weight accorded to the opinion of Dr. Prezio, the consulting physician who examined her pursuant to the request of the Commissioner. Moreover, we note that no treating or examining physician provided an assessment that Plaintiff had functional limitations that would prevent her from engaging in the range of sedentary work found by the ALJ. It is therefore difficult to construe the nature of Plaintiff's "objections" with regard to her physical RFC. Nonetheless, we observe that the ALJ reviewed and considered the Plaintiff's testimony, examined the medical records relative to her physical impairments and exhaustively discussed

15

the findings contained therein, considered her course of treatment, and considered her work history in fashioning her physical RFC. (R. at 28-33). The ALJ concluded:

> After reviewing the treatment evidence in conjunction with the claimant's subjective complaints, I conclude that, secondary to a combination of difficulties stemming from her diabetes, diabetic polyneuropathy, obesity, status post left plantar fibromatosis excision, and right plantar fibromatosis, the claimant is limited to sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she can never push or pull with her lower extremities, bilaterally; can never operate foot controls, bilaterally; can never climb a ladder, rope or scaffold; can never crawl; and can only occasionally balance, stoop, kneel, or crouch. These findings are supported by the EMG testing of the claimant's lower left extremity, the evident presence of the remaining fibroma on her right foot, remaining pain and numbness in her left foot status post excision of the fibromas, fatigue stemming from recurrently high blood sugar levels coupled with the claimant's obesity, the examination evidence suggestive of some dysfunction, swelling, loss of sensation in the lower extremities stemming from her diabetic polyneuropathy. These findings garner further support from the opinion of Dr. Prezio. Dr. Prezio opined that the claimant has mild to moderate restrictions in standing, walking, squatting, and kneeling because of the left foot pain and to a lesser extent right foot pain. (Exhibit 6F/4). He also indicated that the claimant should avoid any repetitive activity that involves her left foot. (Exhibit 6F/5). In addition to the other noted physical limitations, I have limited the claimant to the avoidance of concentrated exposure to unprotected heights, dangerous machinery, and like hazards due to her difficulties with diabetic sugar highs evidence in the notes of her primary care physician.

(R. at 32-33). All of the above findings are supported by substantial evidence and we find no error in this regard.

Turning to the Plaintiff's mental impairments, Plaintiff argues that the ALJ should have assigned great weight, "if not controlling weight" to the RFC assessment of Dr. Dubro, the consultative examiner who evaluated the Plaintiff pursuant to the request of the Commissioner. *See* (ECF No. 11 at 18-21). Dr. Dubro opined that Plaintiff could follow and understand simple directions and instructions, and was capable of making appropriate decisions. (R. at 289). He further opined, however, that she had marked difficulties in her ability to attend to and remember directions and instructions; had markedly impaired attention and concentration; had marked difficulties in learning new tasks; displayed moderate difficulties in performing daily tasks

independently on a regular basis; had marked difficulties in her ability to perform complex tasks independently; was moderately impaired with respect to her ability to relate to others; and had marked difficulties in her ability to regularly attend to a full-time routine and maintain a full-time schedule. (R. at 289).

We first observe that the treating physician rule does not apply to a consulting physician's opinion. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (doctrine had no application to physician who examined claimant once). The Commissioner's regulations do acknowledge that, as a general principal, opinions from examining sources are given more weight than opinions from examining sources. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). The regulations do not require however, that in every case, an examining physician's medical opinion must be favored over that of a non-examining physician. Instead, the Commissioner considers a number of competing factors, such as, *inter alia*, the extent to which the opinion is supported by a logical explanation and the extent to which the source's opinion is consistent with the entirety of the evidence. *See generally* 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

We find that the ALJ evaluated Dr. Dubro's opinion consistent with this standard, and his decision to assign it little weight is supported by substantial evidence. In according Dr. Dubro's assessment little weight, the ALJ observed that Dr. Dubro's findings regarding the Plaintiff's significant distractibility, which ultimately led to his opinion that Plaintiff was markedly limited in several areas, were inconsistent with the results from Dr. Napoli's examination, which had occurred just a few weeks prior. (R. at 34). In this regard, as the ALJ recited in his discussion of the medical evidence, Dr. Napoli found that Plaintiff displayed normal concentration ability, and had intact insight, judgment and impulse control. (R. at 31). The ALJ further observed that Dr. Dubro's opinion was inconsistent with Plaintiff's ability to maintain work as a part-time waitress. (R. at 34). The ALJ reasoned that if Plaintiff's limitations were as severe as alleged, it was difficult to believe she would be capable of working part-time. (R. at 34).

The ALJ also gave more weight to the opinion of Dr. Andrews, the state agency reviewing psychologist, whose assessment he found more consistent with his RFC determination. (R. at 34). Dr. Andrews concluded that, after a thorough review of the medical

evidence, Dr. Dubro's assessment was inconsistent with the totality of the evidence. (R. at 303). He opined that Plaintiff was capable of substantial gainful activity in a low contact setting. (R. at 303). Plaintiff contends that the ALJ "mischaracterized" and accorded "too much weight" to the opinion of Dr. Andrews. *See* (ECF No. 11 at 21-23. Plaintiff is of the view that Dr. Andrews' opinion with respect to her functional limitations was nothing more than a worksheet and should not have been treated as opinion evidence by the ALJ in formulating her RFC. *See* (ECF No. 11 at 21-22). In support, Plaintiff cites *Stewart v. Astrue*, 2012 WL 1969318 at *6 (E.D.Pa. 2012), which held that an RFC assessment completed by a non-medical evaluator was entitled to no evidentiary weight. *Stewart* is inopposite, however, since the assessment here was completed by a medical consultant, as evidenced by the designation "Medical Consultant's Signature" above Dr. Andrews name on the form. (R. at 307).

We further reject Plaintiff's contention that the ALJ accorded too much weight to Dr. Andrews' assessment, since it is well-settled that the findings of a non-examining physician may be substantial evidence defeating contrary opinions. State agency psychological consultants are "highly qualified … psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i); 416.927(f)(2)(i); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("state agency opinions merit significant consideration"); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (ALJ did not err in rejecting opinion of treating physician in favor of opinions from state agency physicians where treating physicians' opinions were conclusory and unsupported by the medical evidence); *Harris v. Astrue*, 2009 WL 2342112 at *7 (E.D.Pa. 2009) (when consistent with the record, ALJ is entitled to rely on state agency physician's opinion even if contradicted by opinions of treating physician). Therefore, the ALJ was entitled to rely upon Dr. Andrews' opinion in evaluating Plaintiff's RFC.

The ALJ further found it significant that Plaintiff had only begun seeking treatment with a mental health practitioner in December 2011, and there were no limitations of any significant nature noted by a treating source. (R. at 34). An ALJ may rely on what the record does *not* say, as well at what it does say. *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (citations omitted). Here, the record is devoid of any medical evidence from a treating source

18

demonstrating Plaintiff's impairments resulted in mental limitations apart from those credited by the ALJ. *See Lane v. Comm'r of Soc. Sec.*, 100 Fed. Appx. 90, 95 (3d Cir. 2004) (unpublished opinion) (noting that none of the claimant's treating physicians opined that she was unable to work or had any work related functional limitations and this lack of medical evidence was "very strong" evidence that claimant not disabled).

In cases involving contrary medical findings, "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). We find that the ALJ in this case properly evaluated and weighed the medical evidence of record, and his findings in this regard are supported by substantial evidence.

Plaintiff further challenges the ALJ's evaluation of her subjective complaints of pain and/or limitations. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 29 C.F.R. §§ 404.1529(a), 416.929(a); *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir. 1999). In assessing subjective complaints, *SSR* 96-7p and the regulations provide that the ALJ should consider the objective medical evidence as well as other factors such as the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. 20 C.F.R. §§ 404.1529(c), 416.929(c); *SSR* 96-7p, 1996 WL 374186 at *2. As the finder of fact, the ALJ can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

The ALJ found that Plaintiff's subjective complaints regarding the intensity, persistence and limiting effects of her depressive symptoms, as well as her testimony regarding the severity of her pain, were not entirely credible. (R. at 28, 33-34). In regard to Plaintiff's complaints of debilitating pain and her claimed limitations related to her physical impairments, the ALJ

observed that Plaintiff had been largely non-compliant with her diabetes treatment regimen, and Dr. Reddy noted she was not a very motivated patient. (R. at 33). The ALJ also observed with respect to her foot pain, Plaintiff was repeatedly referred for follow-up with a podiatrist, but she declined to return to Dr. Fioretti's care. (R. at 33). The ALJ noted that despite her alleged onset disability date, Plaintiff continued to work full time through March 2010, and reduced her schedule only after her foot surgery in March 2010. (R. at 33). The ALJ found that despite Plaintiff's claim that carpal tunnel symptoms caused her to frequently drop items, she never mentioned these symptoms to Dr. Reddy, and Dr. Prezio's physical examination of her hands was normal and did not reveal any limitations in this area. (R. at 33-34). The ALJ found Plaintiff's testimony was also contradicted by the fact that she continued to work as a waitress, and it would be difficult to perform if she consistently dropped items. (R. at 34). The ALJ found her continued employment undermined her claim that she required assistive devices. (R. at 34). In regard to her depressive symptoms, the ALJ noted that Plaintiff had only begun seeking consistent treatment from a mental health practitioner in December 2011, and there were no treating source limitations of any significant nature noted. (R. at 34).

Plaintiff argues that the ALJ never mentioned her work record, nor did he consider it in evaluating her credibility, citing *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (noting that the claimant's testimony as to his capabilities was entitled to substantial credibility based on his long work history and the fact that it was supported by the medical evidence), *Reider v. Apfel*, 115 F. Supp. 2d 496, 507 (M.D.Pa. 2000) (finding that ALJ failed to properly address claimant's work history and post-accident unsuccessful work attempts), and *Lang v. Barnhart*, 2006 WL 3858579 at *10-11 (W.D.Pa. 2006) (citing cases). Contrary to the Plaintiff's contention, however, the ALJ did, in fact consider the Plaintiff's work history in the credibility calculus. The ALJ noted that despite Plaintiff's alleged onset date, she continued to essentially work full-time through March 2010 and had a "relatively consistent work history" throughout that time, even though she reported she was only working part-time. (R. at 33). The ALJ further noted (as set forth above), that Plaintiff's earnings revealed she stopped working full-time in March 2010 when she had foot surgery, and not due to any limitations resulting from her

impairments. (R. at 33). Moreover, we observe that a claimant's work history alone is not dispositive of the credibility question, and an ALJ is not required to equate a long work history with enhanced credibility, particularly where, as here, the ALJ found that the Plaintiff's claimed limitations were not supported by the medical evidence of record. *See e.g. Polardino v. Colvin*, 2013 WL 4498981 at *5 (W.D.Pa. 2013) (finding remand not required and rejecting plaintiff's argument that she was entitled to a favorable credibility inference based upon her excellent work history where it was clear from the ALJ's decision that he considered record as a whole in assessing plaintiff's credibility); *Christl v. Astrue*, 2008 WL 4425817 at *12-13 (W.D.Pa. 2008) (observing that where there are inconsistencies between a plaintiff's testimony and the medical records that undercut the claimant's credibility, courts have distinguished *Dobrowolsky*, even if the ALJ failed to explicitly discuss work history in the opinion).

In sum, the ALJ considered Plaintiff's subjective complaints in light of the medical evidence and all the other evidence of record, and thoroughly explained in his decision why her allegations of disabling pain and/or limitations were not supported by the record, specifically the objective medical findings and by the Plaintiff's own activities. All of these findings are supported by substantial evidence, and accordingly, we find no error in the ALJ's credibility determination.

## VI. CONCLUSION

Based upon the foregoing, the ultimate decision by the ALJ to deny benefits to Plaintiff was adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 10) is denied, Defendant's Motion for Summary Judgment (ECF No. 12) is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

February 28, 2014

cc/ecf: All parties of record.